FILED

MAR 26 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

In re:                                ) BAP No.  AZ-11-1376-DJuPa
                                      )
AUGUST K. RISTOW, JR. and             ) Bk. No.  10-06491-EWH
VICTORIA REI RISTOW,                  )
                                      ) Adv. No. 10-01141-EWH
            Debtors.                  )
_____)
                                      )
EDUCATIONAL CREDIT MANAGEMENT         )
CORPORATION,                          )
                                      )
            Appellant,                )
                                      )
v.                                    ) **M E M O R A N D U M**[1]
                                      )
AUGUST K. RISTOW;                     )
VICTORIA REI RISTOW,                  )
                                      )
            Appellees.                )
_____)

Argued and Submitted on February 24, 2012
at Phoenix, Arizona

Filed - March 26, 2012

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Eileen W. Hollowell, Bankruptcy Judge, Presiding

Appearances:   Adam Clinton Trampe, Esq. argued for Appellant;
               Terry Lee Goddard, Jr., Esq. for Appellees.

Before:  DUNN, JURY and PAPPAS, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Victoria and August Ristow (collectively, the "Ristows") sought discharge of the student loan debt owed to Educational Credit Management Corporation ("ECMC") as an undue hardship under § 523(a)(8).[2] The bankruptcy court granted partial discharge of the student loan debt. ECMC appeals, contending that the bankruptcy court erred in finding that the Ristows met all three prongs of the test for undue hardship set forth in <u>Brunner v. N.Y. State Higher Educ. Srvcs. (In re Brunner)</u>, 46 B.R. 752 (S.D.N.Y. 1985), <u>aff'd</u>, 831 F.2d 395 (2d Cir. 1987).  We REVERSE.

**FACTS**

A.   <u>The Ristows' employment circumstances</u>

The Ristows are in their early sixties with no dependents. August is an interim Lutheran minister who works with parishes that are "in between" more permanent ministers.  His pay varies by the size of the parish he serves; he earns less at smaller parishes.  August currently works at a large parish in Las Vegas, Nevada, where he expects to work until mid to late 2012.  He stays in Las Vegas whenever he works at the parish; the parish provides his housing and pays certain expenses.

Several years ago, August worked as a furniture repairman and restorer, but he stopped such work due to back problems. Aside from his work at the parish, he has no other source of income.

Victoria has a master's degree in education and an MBA. However, she is unemployed.  For thirty years, she worked as a

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

disability case manager in state-funded vocational rehabilitation programs, providing re-employment assistance to people with disabilities or work-related injuries. She also worked as an international business development consultant.

Because of cutbacks in funding for state vocational rehabilitation programs, Victoria decided to obtain an MBA from the Thunderbird School of Global Management ("Thunderbird") in hopes of developing another career with higher income. She believed that her experience in international business development, as well as Thunderbird's prestigious reputation, would help her transition into a career in international business. Victoria further reasoned that she could use her MBA in other endeavors if she was unable to obtain employment in international business.

Victoria attended Thunderbird from 2006 to 2008, completing the MBA program with a 3.4 GPA. She funded her education with student loans from various lenders. Victoria also continued to work as a disability case manager while attending Thunderbird. However, she was laid off shortly before graduating from Thunderbird.

After graduation, for nearly three years, she tried to find employment in business development, business management and case management. As part of her job-hunting efforts, she joined networking groups, used a private career placement service, and conducted online and phone searches. She managed to obtain a few interviews, but no job offers. Subsequently, she continued to search for employment, though not with the "same intensity,"

3

believing that her MBA had lost some of its value over time.[3]

While searching for jobs, Victoria found short-term employment as a consultant in capital investment; for a contingent finder's fee, she introduced venture capitalists to small start-up companies. She was unable to develop this endeavor into permanent employment due to the poor economy. Victoria also managed to find some employment as an independent contractor in case management, which supplied her one to four cases a year. She supplemented the family income with unemployment benefits.

Like August, Victoria has health problems. Because of a car accident, she needs double-knee replacement surgery, left foot metatarsal fusion surgery and thumb surgery. She has not undergone the double-knee replacement surgery, because she needs to lose weight before doing so. Victoria also has no funds with which to pay for the surgeries. Due to her health, she believes that she only may work jobs that are sedentary or involve light exertion and do not involve high levels of stress or long hours.

B.    The Ristows' chapter 7 bankruptcy filing

The Ristows filed their chapter 7 bankruptcy petition on March 10, 2010. At the time of the bankruptcy filing, the Ristows had $4,675 in monthly net income and $7,011 in monthly expenses.[4] Their monthly net income decreased to $3,614,

---

[3] Victoria testified that her MBA carried "the most weight and [was] the most effective for about two years after graduation." Tr. of March 29, 2011 trial, 47:15-19.

[4] Per their amended Schedule J, the Ristows' monthly expenses were $7,006, before they reduced them.

4

however, when Victoria's unemployment benefits expired sometime postpetition.[5]  Their monthly expenses also decreased to $3,704, after the Ristows surrendered timeshares and a recreational vehicle postpetition and lowered the monthly mortgage payments on their home through a loan modification.

Among their expenses, the Ristows pay approximately $1,210 per month for their home mortgage and $415 per month for utilities.  They also pay $50 per month for laundry, $120 per month for medical expenses and $140 per month for miscellaneous expenses.[6]

The Ristows also make monthly payments of $516 on a 2007 Honda Civic Hybrid and $392 on a 2005 Honda Element.  They report $300 per month in transportation expenses and $96 per month for car insurance.

As of the bankruptcy petition date, the Honda Civic had 53,618 miles on it and the Honda Element had 74,313 miles on it. The Ristows reaffirmed the debts on the Honda Civic and the Honda Element.  Under the reaffirmation agreement for the Honda Civic, they agreed to pay $516.06 per month for 55 months, beginning April 13, 2010.  Under the reaffirmation agreement for the Honda Element, the Ristows agreed to pay $390.65 per month for 20 months, beginning May 30, 2010.

---

[5] Victoria testified that at the time of trial, the Ristows had a monthly net income as high as $3,800.

[6] According to their original and amended Schedule J, the Ristows made payments of $1,000 per month on student loan debt. According to an expense sheet (which appears to have been supplied in answer to ECMC's discovery request), the Ristows apparently no longer make such payments.

5

C.    The Ristow's § 523(a)(8) complaint

The Ristows filed a complaint to discharge student loan debts totaling $204,764 under § 523(a)(8).  They asked that the student loans be discharged because repayment of the student loans would impose an undue hardship on them.  Although the Ristows named several lenders as defendants, only ECMC answered the complaint.[7]  The Ristows later obtained a default judgment against the other lenders.

Victoria owed ECMC $88,966.30 in student loan debt as of July 29, 2010.  ECMC contended that the entire amount of the student loan debt was excepted from discharge.

At the March 29, 2011 trial, Victoria testified that she made nominal monthly payments of $150 to $160 on her student loan debt for a few months after the loan repayment deferment period ended.[8]  She admitted that she had been advised of her student loan repayment options, which were the William D. Ford Income-Based repayment plan ("Income Based Plan") and the William D. Ford Income Contingent repayment plan ("Income Contingent Plan")(collectively, "Repayment Plans").  Under the Income Based Plan, Victoria's monthly payment would be $268.91.  Under the Income Contingent Plan, her monthly payment would be $479.97.

---

[7] The Ristows named in their amended complaint National Collegiate Trust/The Education Resources Institute (collectively, "National Collegiate Trust"), Great Lakes Educational Loan Services ("Great Lakes Loan") and Xpress Loan Services/Student Loan Xpress, Inc. ("Xpress Loan") as defendants.  ECMC is the successor in interest to Xpress Loan and Great Lakes Loan.

[8] Victoria later testified that she made a total of $600 to $800 in payments on her student loan debt.

6

Victoria explained that she decided not to make payments under either the Income Based Plan or the Income Contingent Plan because: (1) she did not want August to be liable for any payments; (2) she and August did not have any extra disposable income to make even the minimum payments; and (3) she would have to make payments until she was 85 or 90 years old, given the 25 to 30-year repayment term.

Victoria testified that "the dual income that [they] . . . had at one time when both of [them were] working and getting the kind of professional incomes [they] should be getting, [was] about [$]150 to $180,000." Tr. of March 29, 2011 trial, 49:9-12. She did not anticipate that she and August would return to their former level of income, however, based on her experiences over the last three years. Victoria testified that, after one interview with a company, she was informed that she did not advance past the first interview because she "was too old and [she] wouldn't make it with the technology." Tr. of March 29, 2011 trial, 59:8-10. Moreover, she pointed out, their additional sources of income (namely, August's furniture repair and restoration work) were no longer viable due to the economy and their health.

Victoria explained that, with their current income and expenses, she and August either "broke even" or had approximately $100 in disposable income left over. Tr. of March 29, 2011 trial, 74:16-19. She explained that, based on their current financial circumstances, she did not see how she and August could cut their expenses; they were "just, you know, scraping by as it [was], so." Tr. of March 29, 2011 trial, 57:12-13.

7

Victoria testified that she initially sought jobs with salaries between $101,000 to $150,000, though "she didn't stipulate to that criteria." Tr. of March 29, 2011 trial, 81:11-15. She admitted that, in her search for employment, a $90,000 salary was the minimum salary she would consider. Victoria explained that she had been told that "six figures and above [salary was] what MBA people [got]." Tr. of March 29, 2011 trial, 42:24-25.

Victoria further testified that she believed that she would repay the student loans either with the income she earned through employment with her MBA or by consolidating the student loans and/or using the equity in the Ristows' home. She asserted that before she applied to Thunderbird, she had been told that she would very likely get a job within six months of graduation.

At the end of the trial, the bankruptcy court concluded that, based on the evidence the Ristows presented, the Income Based Plan and the Income Contingent Plan "would be a stretch because [Victoria] was unemployed and the economy [was] very difficult right now." Tr. of March 29, 2011 trial, 89:1-3. It acknowledged, however, that because the Ristows would be paying off the Honda Element in December 2011, they might have some excess income with which to pay off some of the student loan debt. The bankruptcy court pointed out that neither the Ristows nor ECMC addressed the issue of a partial discharge of the student loan debt. The bankruptcy court then gave the Ristows and ECMC the opportunity to present post-trial briefs on the issue.

The bankruptcy court issued a memorandum decision

8

("Memorandum Decision") after the parties submitted their post-trial briefs. It applied the three-prong test established in Brunner, which was adopted by the Ninth Circuit in United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1112 (9th Cir. 1998), to determine undue hardship under § 523(a)(8).

The bankruptcy court found that the Ristows met all of the elements of the Brunner test. Although it determined that the Ristows satisfied the Brunner test, the bankruptcy court refused to discharge all of Victoria's student loan debt.

The bankruptcy court recognized that the Ristows would never have sufficient income with which to pay the student loan debt in full. It found, however, that once they paid off the Honda Element in December 2011, the Ristows would have some surplus income with which to pay off some of the student loan debt. It figured that the Ristows would have approximately $100 per month surplus income, after taking $300 in transportation expenses into account under the chapter 13 trustee guidelines.

The bankruptcy court determined that, as there was no statute of limitations on student loan debt, the repayment period should be 25 years. It determined that the interest rate should be 8%, as applied to federal consolidated loans. The bankruptcy court calculated that the total amount of the student loan debt excepted from discharge was $13,000, based on a payment of $100.34 per month over 25 years at 8% interest.

On July 7, 2011, the bankruptcy court entered a judgment consistent with its rulings. ECMC timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C.

9

§§ 1334 and 157(b)(1) and (b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Did the bankruptcy court err in granting the Ristows a partial discharge of the student loan debt?

**STANDARDS OF REVIEW**

We review the bankruptcy court's factual findings for clear error and its interpretation of the Bankruptcy Code de novo. ECMC v. Mason (In re Mason), 464 F.3d 878, 881 (9th Cir. 2006), quoting Miller v. Cardinale (In re DeVille), 361 F.3d 539, 547 (9th Cir. 2004).  We review mixed questions of law and fact de novo.  Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997).  A mixed question of law and fact exists when the facts are established, the law is undisputed, and the issue is whether the facts satisfy the legal standard.  Id.  Such mixed questions require consideration of legal concepts and the exercise of judgment regarding the values that animate legal principles.  Id.

The question as to whether student loan debt imposes an undue hardship on a bankrupt debtor is such a mixed question, reviewed de novo.  Rifino v. United States (In re Rifino), 245 F.3d 1083, 1086-87 (9th Cir. 2001); Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane), 287 B.R. 490, 493 (9th Cir. BAP 2002).

**DISCUSSION**

In this appeal, we must deal with the consequences of several arguably poor decisions: It was imprudent of Victoria to incur student loan debt exceeding $150,000 to pursue her MBA at

10

her advanced age, and it was imprudent of her lenders to lend it to her.  As acknowledged by ECMC in its opening brief, "In 2006, Victoria Ristow decided to finance an MBA with student loans despite several factors suggesting she'd never be able to fully repay them."  Appellant's Opening Brief at 2 (emphasis added).  Now, the Ristows are in bankruptcy, and we consider whether the bankruptcy court erred in partially discharging Victoria's approximately $90,000 obligation to ECMC, leaving a balance owing of $13,000 payable at 8% interest.

Under the Bankruptcy Code, student loan debt generally is presumed excepted from discharge under § 523(a)(8)[9] unless the debtor establishes that requiring repayment would impose an undue hardship.  The Bankruptcy Code does not define "undue hardship." ECMC v. Nys (In re Nys), 446 F.3d 938, 944 (9th Cir. 2006).  But using the adjective, "undue," indicates that Congress viewed garden-variety hardship as an insufficient justification for discharging student loan debt.  In re Pena, 155 F.3d at 1111.

> What separates a "garden-variety debtor" from a debtor who can show "undue hardship" is the realistic possibility that a "garden-variety debtor" could improve her financial situation in the future.  With increased financial stability, a debtor can make payments on her student loans and maintain a minimal

---

[9] Section 523(a)(8) provides, in relevant part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor . . . for . . . an education benefit overpayment or loan made, insured, or guaranteed by a government unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution . . . .

11

standard of living. In comparison, forcing debtors who cannot reasonably be expected to increase their future income to make payments on their student loans when it causes them to fall below a minimal standard of living constitutes an "undue hardship."

In re Nys, 446 F.3d at 944.

To meet the "undue hardship" test of § 523(a)(8), the debtor must demonstrate that: (1) she cannot maintain, based on current income and expenses, a minimum standard of living for herself if forced to repay her student loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the student loan repayment period; and (3) she has made a good faith effort to repay the student loans. In re Pena, 155 F.3d at 1111-12, adopting the test ("Brunner test") from Brunner, 46 B.R. at 753. The debtor bears the burden of proof to establish all three elements of the Brunner test. Rifino v. U.S. (In re Rifino), 245 F.3d 1083, 1087-88 (9th Cir. 2001). If the debtor fails to meet her burden as to any one of these elements, the inquiry ends with a finding that the student loan debt is not excepted from discharge. Id. at 1088. Accordingly, the path to a discharge of student loan debt is not easy.

On appeal, ECMC argues that the Ristows failed to meet their burden as to all three of the Brunner test elements. We agree with ECMC as to one element, the "good faith" effort to repay, but that conclusion is enough to require reversal of the bankruptcy court's decision.

The third element of the Brunner test requires that the debtor establish that she made a good faith effort to repay the subject student loan(s). See In re Pena, 155 F.3d at 1114.

12

"Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses." In re Mason, 464 F.3d at 884, quoting In re Birrane, 287 B.R. at 499. In addition, courts will consider the debtor's record of making payments on the student loan debt and the debtor's efforts, if any, to negotiate a repayment plan. Id. However, the debtor's history of making or not making student loan payments is not dispositive. Id. at 499-500.

In considering the good faith effort element, the bankruptcy court noted that Victoria "timely sought forbearance and made some minimal payments from her unemployment benefits" on the ECMC loans. Memorandum Decision at 11. As noted above, Victoria testified that she made a total of $600 to $800 in payments on her student loan debt.

ECMC focuses on two portions of the evidentiary record that we agree are critical in light of Ninth Circuit authorities. First, Victoria's testimony indicates that following her receipt of her MBA, during the intensive period of her job search, she focused on jobs with compensation ranging from $101,000 to $150,000, and the minimum compensation she would consider was $90,000 with incentive bonuses. Her career placement firm advised her that in any given week, only about 0.05% of the available employment positions provided compensation in her preferred range. She never sought employment in lower paying positions.

The bankruptcy court noted that Victoria's testimony "did not indicate that she was unwilling to work for less than six figures" (Memorandum Decision at 8), but that determination does

13

not meet the Ristows' burden to establish that they sufficiently exerted themselves to maximize their income. As ECMC emphasizes, there is nothing in the record to indicate that Victoria attempted to secure any "minimum-wage part-time jobs" to pay her student loan debts. In fact, as ECMC further notes, "If [Victoria] worked at a [Lowe's] customer service desk like the debtor in [ECMC v. Blackbird (In re Blackbird), 2008 WL 8444793 (9th Cir. BAP July 11, 2008)]–or in any other 'light sedentary' job–for minimum wage, ten hours a week, she'd be able to make her loan payments."[10] Appellant's Reply Brief at 8-9.

We do not share ECMC's blithe assumptions about the increased net income that may result for the Ristows from part-time, minimum wage jobs once the expenses associated with such employment are considered. See B. Ehrenreich, Nickel and Dimed: On (Not) Getting By in America (2001). However, we recognize that the lack of any evidence that Victoria considered employment for compensation at any amount less than $90,000 is telling in this context.

Second, Victoria testified that she was aware of the Income Based Plan and Income Contingent Plan for payment of her student loan debts and would not apply for them. Under the Income Based Plan, her initial monthly payment would be $268.91, and after a term of twenty-five years, any unpaid balance would be forgiven.

---

[10] We note that in light of his "doctorate education," the fact that the debtor in In re Blackbird had obtained a job as a customer service representative at Lowe's did not satisfy the good faith effort to repay element of the Brunner test. In re Blackbird, 2008 WL 8444793 at *7.

14

Where income contingent repayment programs are available, a failure to pursue such options is considered in determining whether a debtor has met her burden to establish a good faith effort to repay student loan debt. See, e.g., In re Mason, 464 F.3d at 884 (the debtor failed to pursue an income contingent repayment plan option with diligence); In re Birrane, 287 B.R. at 500 (concluding lack of good faith where debtor made some effort to renegotiate payment of student loan debt but failed to pursue an income contingent repayment plan option when it became available).

As the bankruptcy court noted, Victoria testified that she rejected applying for either of the Repayment Plans because: 1) she did not want her husband to become obligated for the payments, 2) the Ristows could not afford the Income Based Plan payments currently, and 3) the twenty-five year payment term meant that the Ristows would be obligated to make payments under the Income Based Plan through their mid-eighties. The bankruptcy court concluded that the Ristows' reasons for not pursuing the Repayment Plans did not demonstrate good faith, and we agree. However, the bankruptcy court's remedy for the Ristows' deficiency in evidencing a good faith effort to repay was to grant a partial discharge, discharging approximately $77,000 of Victoria's student loan debt to ECMC, on top of the $100,000+ of student loan debt already discharged by default in the Ristows' adversary proceeding. As noted above, Ninth Circuit authorities are clear that if the debtor does not meet the burden of proof on any element of the Brunner test to discharge student loan debt, the debt is not discharged.

15

**CONCLUSION**

For the foregoing reasons, we conclude that the Ristows did not meet their burden of proof under the Brunner test to establish that they are entitled to a discharge of their student loan debt to ECMC as an undue hardship.  Accordingly, we REVERSE.

16